### J. S. HUDSON et al. v. W. H. HUDSON.

(Filed 30 April, 1907).

**Deeds—Cancellation—Mental Capacity—Burden of Proof.**—When in an action to set aside and cancel a deed for the want of sufficient mental capacity, there was evidence tending to show that prior and subsequent to the time of its execution the grantor was subject to attacks during which she was mentally deranged, but not continuously so, the burden of proof is upon the plaintiff to show the want of sufficient capacity of the grantor to understand the force and effect of her act at the time of executing the deed.

CIVIL ACTION, tried before *Ward, J.,* and a jury, at January Term, 1907, of the Superior Court of CABARRUS County.

Plaintiffs seek to have a deed, executed by Sarah A. Hudson to defendant, cancelled for that she did not have, at the time of executing the same, sufficient mental capacity to understand the force and effect of her act. The only issue submitted to the jury was directed to that question. They introduced a number of witnesses whose testimony tended to

show that the grantor was, at the date of the deed, about eighty-five years of age, in feeble health and subject to "spells" or attacks during which she was mentally deranged. The defendant introduced witnesses whose testimony tended to show that, at the time she executed the deed, she understood what she was doing, what property she was conveying, and her relationship both to her property and her family. The evidence, in this respect, was conflicting. Among other witnesses introduced by plaintiffs, James Alexander testified: "I knew Sarah A. Hudson. She died last year—9 March. Had been with her two years. When I first moved there her mind was tolerably good, but later on she had bad spells. I went there 15 July, 1903. She was 83 or 84 years old. Her mind was not good, I thought, from her acts. She came in and took some clothing off my beds. She told me herself that her mind was not good. She came and got some of my wearing clothes; said she was moving home; she was in her own house; it was a double house, with partition. She contended with me that she was not at home; that she was at her granddaughter's. It was before the deed was made, her granddaughter living one and one-half miles from there. She was in her own house. I went in and tried to convince her that she was at home, calling her attention to the clock and other things in the house; she said her clock and other things always went with her. She was not there when she made the deed; she was living with the defendant. In my opinion, she did not have capacity sufficient to know what property she had or to whom she was giving it, and the effect of it. When she had spells she was out of her head; not so much so when she was in her head—she would know she had a house. She had no mind. I left there just before she died. She said she had no mind. I went out there from town. She did the renting to me; she had a good mind.

The defendant came out to get me to go out to stay with her. When the spells were on her she knew almost nothing."

For the defendant, Dr. S. A. Grier testified: "I was the physician of Mrs. Hudson for twenty-three years up to her death. She was a woman of fine mind till eight years before she died. She had an attack of the grippe. When she had an acute attack her mind would waver, but when she was better of grippe she would recover. Her heart became weak and feeble, and her brain would become weakened, but when her heart would resume she would recover mentally. Those spells did not last longer than one and one-half days. Saw her on 14 February, 1906; her mind was as clear as ever it was. She said William would pay me for coming, as she had given him all she had. It was daytime that I went there. The chief cause of mind trouble was grippe and heart failure. Grippe may eventuate in absolute insanity, but in this case it did not so result." Witness is asked hypothetical question, based on the evidence as to Mrs. Hudson puting chamber on her feet, bonnet on her feet, etc., and he says: "She was not in her right mind. Middle of December I was there and she was sick; her mind was wandering; those spells were delirium. She was blind in one eye, not in the other. The other eye was very good. She had had advantages, both educationally and socially."

There was other testimony, for both sides, of the same character. The plaintiffs requested his Honor to instruct the jury:

"The burden of proof is upon the plaintiffs, and they must show, by a preponderance of the evidence, that at the time of the execution of the deed in question Mrs. Sarah A. Hudson did not have sufficient mental capacity to execute the same; but should the jury be satisfied from the evidence that at any time prior to the execution of the deed she was

insane or did not have sufficient mental capacity to execute the deed, then the burden of proof shifts and it devolves upon the defendant to satisfy the jury by a preponderance of the evidence that she, at the time of the execution of the deed, was of sound mind."

This request was denied, and plaintiffs excepted. His Honor instructed the jury that the burden was upon the plaintiffs to show, by a preponderance of the evidence, that Mrs. Hudson was mentally incapable of executing the deed, explaining, correctly, the standard of mental capacity required for the execution of a deed. That by the law all persons were presumed to be sane. That, in the light of all of the evidence, they would inquire whether, at the time she signed the deed, Mrs. Hudson had mind and intelligence sufficient to enable her to have a reasonable judgment of the kind and value of the property embraced in the deed, and to understand the effect of her act in making the deed, and, if they so found, they would answer the issue "Yes"; but, if they found she did not have such mind and intelligence, as stated, they would answer the issue "No."

His Honor further told the jury that the law gave peculiar importance to the testimony of the attending physician and subscribing witness. To this instruction plaintiffs excepted. The defendant introduced the subscribing witness, who testified regarding the condition of the grantor at the time she executed the deed. The jury answered the issue in the affirmative. There was judgment accordingly, and plaintiffs duly excepted and appealed.

*W. G. Means* for plaintiff.
*Montgomery & Crowell* for defendant.

CONNOR, J., after stating the case: This Court, in *Ballew v. Clark,* 24 N. C., 23, said: "The general rule is that sanity is to be presumed until the contrary be proved; and

when an act is sought to be avoided on the ground of mental imbecility the proof of the fact lies on the person who alleges it. On the other hand, if a general derangement be once established or conceded, the presumption is shifted to the other side and sanity is then to be shown at the time the act was done. Similar language is used in *Wood v. Sawyer (Johnson will case)*, 61 N. C., 251 (p. 277). The general principle embodied in the instruction is conceded by counsel for appellee, but they insist that the testimony does not bring the case within the rule. That the presumption of sanity obtains until it is shown that, prior to the execution of the deed, the grantor was insane, in the sense of being mentally unsound, for some appreciable period of time, excluding the idea of a mere mental aberration or derangement, caused by sickness, accident, or other temporary cause or condition. This, we assume, was the reason upon which his Honor declined to give the instruction. "The rule that when insanity is proved or admitted to have existed at any particular time it is to be presumed to continue applies only to cases of what is called 'general' or 'habitual' insanity. Like all presumptions, it arises from our observation and experience of the mutual connection between the facts shown to exist and those sought to be established by inference from those facts; and when observation and common experience fail to show that the insanity proved, in the particular case, was, in its nature, permanent, the presumption fails. When insanity appears as the result of some special and temporary cause, and experience shows that the cause being removed the effect will probably disappear, the presumption does not prevail." Buswell on Insanity, sec. 195.

"There must be kept in view the distinction between the inferences to be drawn from proof of an habitual or apparently confirmed insanity and that which may be only

temporary. The existence of the former, once established, would require proof from the other party to show a restoration or recovery; and, in the absence of such evidence, insanity would be presumed to continue. But if the proof only shows a case of insanity directly connected with some violent disease with which the individual is attacked, the party alleging the insanity must bring his proof by continued insanity to that point of time which bears directly upon the subject in controversy, and not content himself with proof of insanity at an earlier period." *Hix v. Whittlemore,* 45 Mass., 545. The law is well stated in 22 Cyc., 1116: "The presumption arises only in cases where the insanity is continuing and permanent in its nature or where the cause of the disorder is continuing or permanent." The fact that a party has "spells," during which his mind was affected, does not relieve the plaintiff of the burden of showing insanity. *Stewart v. Flint,* 59 Vt., 144; *Brown v. Riggin,* 94 Ill., 560. Occasional flightiness and wandering of intellect during sickness is not sufficient to change the burden of proof. *McMaster v. Blair,* 29 Penna. St., 298. *Delirium tremens,* prior to the homicide, caused by strong drink, does not cast upon the State the burden of showing sanity at the time of the act. *State v. Sewell,* 48 N. C., 245.

In the light of these and other authorities, sustained by the reason of the thing, we think that his Honor was correct in declining the instruction. While the testimony regarding her acts and language prior to the execution of the deed were competent to be considered, and for that purpose were submitted to the jury, they do not show habitual insanity within the meaning of the rule of law which rebuts the presumption of sanity at the time of the act in question. The exceptions to the charge as given are without merit.

While there was strong evidence tending to sustain plaintiffs' contention the case has been fairly submitted to the jury, who doubtless knew the witnesses and were capable of duly weighing their testimony and opinions. The aged grantor appears to have been content with the disposition of her land, and, in the light of the verdict, we see no reason for disturbing the judgment.

No Error.